IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JESUS ACOSTA ARTICA, JUAN ZELAYA, NILSON CABALLERO, JOSE RUIZ, ADONIS LOBO and ERNESTO GALEANO, Individually and on Behalf of all other Employees Similarly Situated,<br><br>Plaintiff,<br><br>-against-<br><br>J.B. CUSTOM MASONRY & CONCRETE, INC., J.B. BATTAGLIA, J.B. CONTRACTING, ALFREDO J. BATTAGLIA, JOHN BATTAGLIA and SALVATORE MANNINO, Jointly and Severally,<br><br>Defendants. | ECF<br><br>09-CV-3796 (CBA)(RER) |
| JESUS ACOSTA ARTICA, JUAN ZELAYA, NILSON CABALLERO, JOSE RUIZ, ADONIS LOBO, ERNESTO GALEANO, HUGO RIVAS and JAIME RIVAS, Individually and on Behalf of all other Employees Similarly Situated,<br><br>Plaintiff,<br><br>-against-<br><br>J.B. CUSTOM MASONRY & CONCRETE, INC., J.B. CUSTOM CORP., J.B. HOLDING & PROPERTY CORP., J.B. RESIDENTIAL, LLC, ALFREDO J. BATTAGLIA, JOHN BATTAGLIA, JOSEPHINE BATTAGLIA and SALVATORE MANNINO, Jointly and Severally,<br><br>Defendants. | 11-CV-0842 (CBA)(RER) |

**<u>CERTAIN DEFENDANTS' TRIAL MEMORANDUM</u>**

1

J.B. Custom Masonry & Concrete, Inc. (hereafter "**Custom**"), Alfredo J. (Joe) Battaglia, Giovanni Battaglia(sued as John Battaglia), and Salvatore Mannino (collectively "**Defendants**") respectfully file this Memorandum as an introduction to the most significant issues to be tried in these consolidated cases.[1] This Memorandum is filed under a dual caption because Plaintiffs inexplicably named Defendants in both of these consolidated cases even though the claims asserted in the two cases are essentially identical.[2]

## THE CASE IN A NUTSHELL

Custom is a construction company in Queens controlled and managed by Joe Battaglia.[3] Custom paid its day laborers a daily wage from its organization until 2009, when Joe became aware of some of the requirements of the wage and hour laws.Custom now realizes that its practices*may have* resulted in incidental and infrequent violations of state and federal wage and hour laws.In recognition of that fact, Custom has served offers of judgment in an aggregate amount of almost $400,000 to resolve Plaintiffs' claims.Plaintiffs, however, rejected those offers and continue their effort to leverage those potential, but non-willful, violations into a multi-million dollar case based on incredible claims that, as construction workers, they worked 12 hours a day 6 or 7 days a week, even during the biggest downturn in construction in New York City in over 70 years.

---

[1] Plaintiffs have named as a defendant "J.B. Contracting", which does not exist as an entity separate from J.B. Custom. "J.B. Contracting" is merely a nickname for Custom. Defendants also note that counsel for Defendants does not represent any other defendants in Case No. 11-CV-0842 (the "**11 Case**").

[2] As noted in Defendants' opposition to the motion to file a second amended complaint in Case No. 09-CV-3796 (**the "09 Case"**) and in opposition to the motion to consolidate the 11 Case,the amended complaint in the 09 Case and the complaint in the 11 Case could be construed to attempt to further confuse the situation through use of ambiguous defined terms and allegations.For simplicity, Defendants will assume that the claims against Defendants in the two cases are identical.

[3] Joe Battaglia does not dispute that he is an "employer" with respect to employees of Custom to the extent that a Plaintiff establishes that the FLSA or, if applicable, New York's wage and hour law, applies to Custom.

Given this circumstance, Defendants' case will primarily focus on the following discrete issues:

- Defendants Giovanni Battaglia and Salvatore Mannino were not "employers";
- Any violations of overtime laws were not willful;
- Plaintiffs' testimony cannot create a "just and reasonable inference" of liability or damages in the amounts claimed;
- Plaintiffs' state-law prevailing wage and overtime claims cannot be proved with admissible evidence; and
- No Defendant retaliated against any Plaintiff within the legal meaning of "retaliation", and no Plaintiff has suffered compensable harm from any alleged retaliation.

In addition, depending on the Court's resolution of pending pre-trial motions, Defendants may assert additional statute of limitations defenses.Defendants willalsorequire each Plaintiff to proffer sufficient evidence to establish each element of such Plaintiff's specific claims.[4]In particular, each Defendant will hold each Plaintiff to proving each element of a wage and hour claim for each pay period as to which such Plaintiff alleges a violation of the FLSA or, if applicable, the New York wage and hour law.

## FACTUAL BACKGROUND

### Custom's Construction Business Begins

Joe Battaglia's father Giovanni immigrated to the U.S. from Italy in 1968.For years thereafter he supported his family as a brick mason working for a daily wage or as an independent contractor.His son Alfredo, now known as Joe, dropped out of school in the 7th grade and started working as a day laborer doing odd jobs. By 1983, he was working as a day laborer in construction, often with or for his father.As Joe became more skilled in the trade, he also became

---

[4] Defendants are delivering proposed jury instructions to the Court that will further elucidate Defendants' views as to the issues to be tried.

3

more ambitious. In 2002, with his father's blessing, Joe started Custom as a concrete and masonry construction company with its office and shop in Queens.[5]

**Custom's Hiring Practices**

By 2004, Custom succeeded to the point that it sometimes hired skilled and unskilled day laborers when there was more work than its normal crew could handle. Like many small contractors, Custom went to local street-side gathering places and hired men looking for day jobs. Following the practice that Joe and his father had learned as workers, Custom hired the workers by the day and agreed to pay a set wage per day. When Custom had enough work, Joe would tell satisfactory workers to come to Custom's shop by 7 a.m. if they wanted to keep working on a job. Day laborers were generally paid in cash once a week, or upon completion of their job, if shorter.

Custom's business reputation increased rapidly. As the economy boomed from 2004 through mid-2007, Custom often had enough work that it regularly employed certain laborers, especially those with skill as masons, carpenters or drivers. While it still hired laborers at street-front meeting places, its more regular day laborers also brought in relatives and friends and introduced them to Joe. In each case, the worker would be offered a daily wage, which depended on experience and skill, and was told to show up at the shop before 7 if he wanted to work on a given day and Joe would decide if there was work that matched the laborer's skill and experience.

**Work Hours**

Workers selected to work on a given day were assigned to a specific job site or, sometimes, to work in the shop. The work day began when work started at the site, which was usually 7:30 for

---

[5] Giovanni Battaglia has never owned an interest in Custom and has never served as an officer or director of Custom. From time to time, he would help Joe out by acting as a foreman or skilled worker on a specific job.

jobs near the shop or later for jobs in Manhattan. Workers generally received a morning and afternoon coffee break and a lunch break of 30 or 60 minutes. The work day ended when work was finished for the day at the site. Most days ended at 4:30, but some union jobs or jobs in Manhattan ended at 3:30. Of course, many jobs ended in midday either because the work was completed or because of weather or materials issues. Workers could travel to and from the site as they chose, but most rode in a company truck since they did not have their own private transportation and the truck-ride was free.

As business continued to increase with the economic boom and as more employees brought in friends and relatives looking for work, Custom began to experience issues related to determining whether workers who claimed to have worked really did work. In response, Custom installed a hand-scanner/clock in the shop in about 2005. Workers would scan in when they arrived and scan out if they came back to the shop at the end of the work day. Workers who went straight home from the job site could call Custom's office assistant and she would make an entry in the clock's system that would show the employee worked that day.[6]

In sum, the amount of hours any specific employee worked in any given week could and did vary dramatically. An employee might work six 10 hour days in the summer, or he might work two 3 hour days when it rained or in the winter when it was too cold to work outside.

**The Daily Wage**

The testimony will show that Custom paid Plaintiffs an agreed-upon daily wage.[7] Some Plaintiffs received increases in their daily wage as they gained experience and skill. If an employee was paid $100 a day and worked 6 days in a week, he received $600, usually in cash. If he worked 4

---

[6] Obviously, this system was not fool-proof, and disputes continued to arise as to whether a given laborer had worked on a given day since nothing stopped someone from showing up at the shop and scanning in before getting a work assignment.

[7] There is nothing unusual or unlawful about a "day rate." *See,* U.S. Dept. of Labor, *FLSA Overtime Calculator Advisor* (http://www.dol.gov/elaws/esa/flsa/otcalc/i14proc.asp?s=none): "An employee may be paid on the basis of a flat sum for a day's work without regard to the number of hours worked in the day. This is known as a day rate."

days in a week, he received $400. The hours worked in a day did not matter except that Custom would sometimes pay a percentage of the daily wage if the job ended, say, before noon. Custom might also increase the wage for a given day if the employee put in an especially good day, and it might deduct from the daily wage if the worker left early or otherwise did not perform the agreed "day's work."

### *Potential* FLSA Violations: The "Regular Rate of Pay"

Thus, Custom does not dispute that there were weeks in which a specific Plaintiff may have worked more than forty hours and yet not have received one and a half times his regular rate for the hours over 40.[8] For example, if a Plainitff and Custom agreed to a $100 daily wage and the Plaintiff worked 60 hours in a week, Custom would have paid the Plaintiff $600; for 60 hours' work that would mean his "regular rate of pay" was $10.[9] The Plaintiff should have received an additional $5 an hour (half time) for the 20 hours of overtime or $100. In another week, however, if there was bad weather or only a small job, the Plaintiff might have worked only 30 or 40 hours, and no violation would have occurred.

### The "City Contract"

In about 2009, Custom won a bid to repair sidewalks for the Borough of Brooklyn. The contract was subject to the "prevailing wage" laws and lasted less than a year. Custom had not previously performed such a contract, and Joe hired Sal Mannino to administer the payroll system to assure compliance with those laws. Sal had no authority to hire or fire employees and merely made sure that the required paperwork was properly completed and that the payroll checks were properly issued. Because the "prevailing wage" was higher than the workers' regular pay, Custom rotated

---

[8] The regular rate is determined by adding together the employee's pay for the workweek and all other earnings and dividing the total by the number of hours the employee worked in that week. *See,* U.S. Dept. of Labor, *FLSA Overtime Calculator Advisor,* http://www.dol.gov/elaws/esa/flsa/otcalc/glossary.asp?p=Regular%20Rate.

[9] *See* Appendix A hereto, which sets forth the calculation from the FLSA Overtime Calculator Advisor for the facts assumed in this example.

its best workers on that contract so that they could share in the benefits of higher pay than was available in private construction projects. In accordance with the requirements of the administrator's requirements, employees signed a receipt agreeing that they were paid the prevailing wage.

## LEGAL ISSUES

This is a pretty straightforward wage and hour case, and Defendants' proposed jury instructions reflect that fact. At present, Defendants believe only a couple of key points are worth stating in addition to those currently before the Court on pre-trial motions.

**Plaintiff's Burden of Proof**

Custom concedes that its existing payroll records do not completely and accurately reflect all time worked and all compensation paid to Plaintiffs. In this situation, *Grochowski v. Phoenix Const.*, 318 F.3d 80, 87-88 (2d Cir. 2003), succinctly states Plaintiffs' burden of proof (emphasis added):

> An employee who sues for unpaid minimum wages or overtime compensation has the burden of proving that the employer did not compensate him for completed work. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946). Under the FLSA, even "[w]hen accurate records or precise evidence of the hours worked do not exist, *an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.*'" *Tran v. Alphonse Hotel Corp.*, 281 F.3d 23, 31 (2d Cir.2002) (quoting *Anderson*, 328 U.S. at 687, 66 S.Ct. 1187).

In *Grochowski*, the Second Circuit affirmed a directed verdict against four employees for failure to satisfy their burden of proof because they offered no or only vague testimony as to the days worked and the jobs on which they worked. *Grochowski* is directly on point in this case because Plaintiffs in their depositions were unable to recall with any specificity where they worked on specific dates, how many hours they worked during specific weeks or months, or even whether

theyworked on specific jobs.As a result, no jury could make a "reasonable and just inference" that a specific Plaintiff worked more than 40 hours in a specific week.No jury could, therefore, determine, for that week, whether the compensation paid to the Plaintiff did not comply with the FLSA.

While various courts have held that a FLSA plaintiff can meet his burden of proof by testifying as to his recollection, it necessarily follows that he must have some recollection that would establish specific violations.As the court noted in *Reich v. Southern New England Telecomm.*, 121 F.3d 58, 67-68 (2d Cir. 1997) (discussing cases), the application of the "reasonable and just inference" standard varies with the circumstances and requires careful consideration of whether the proffered evidence can apply across plaintiffs and time periods.Here, the evidence will show that no Plaintiff can testify as to a specific recollection as to the details of any specific work week except to the extent the Plaintiff has retained the specific pay stubs provided by Custom on payday.

Stated differently, each Plaintiff must show "concrete particulars" of violations as to specific payroll periods.*Kolesnikow v. Hudson Valley Hosp. Center*, 622 F. Supp.2d 98, 118-19(S.D.N.Y. 2009) (granting summary judgment against plaintiff in the absence of evidence showing the amount of extra time that she worked each week; plainitff'stestimony did not provide a sufficient basis to infer that she worked more than 40 hours in any given week.)Testimony that "I worked 60 hours every week", without any recollection of the work done that week or the location or any other detail is insufficient to meet the Plaintiff's burden.

**FLSA Statute of Limitations:Willfulness**

The FLSA statute of limitations is two years unless Plaintiffs can establish that a Defendant's violation of the statute was "willful." In that instance, the statute of limitation would extend to a third year.29 U.S.C. § 255(a).Plaintiffs will not be able to establish willfulness.

In *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988), the Supreme Court held the statute of limitations is two years unless the plaintiff proves that *"**the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute**.*"Here the testimony will show that Custom and Joe Battaglia believed in good faith that a daily wage was legal and that Custom's employees were not entitled to an overtime premium.

**Alleged Retaliation**

Custom's employees and Joe Battaglia's friends all agree that Joe is a temperamental, demanding, loud and often ill-mannered person who uses rough and profane language even to close associates.Those personal attributes are not relevant to any wage and hour claim, and inquiry regarding Joe's personality should be excluded from evidence with respect to those claims as irrelevant and prejudicial, especially to the extent that assertions are made of racism or other bias.

Nor is Joe's conduct or verbiage relevant to any retaliation claim.After all, as courts have often recognized, the federal labor laws do not set forth a general civility code for American business.*See, e.g., Burlington N. & S. F. R. Co. v. White*, 548 U. S. 53, 69 (2006).Every Plaintiff who was deposed testified that they dislike Joe and that he was rude, mean, and abusive to them the entire time the Plaintiff worked for Custom.Yet Plaintiffs continued to work for him.No reasonable jury could conclude that the same conduct and speech occurring after a Plaintiff stopped working for Custom and sued Joe would be taken as a credible threat of physical or economic harm.Absent such real harm, in the sense that it was "materially adverse", no Plaintiff

can establish a claim of retaliation. *Id.* at 67-69 (applying title VII retaliation provision, which is modeled on FSLA provision).

## CONCLUSION

Plaintiffs' have grossly overstated their FLSA claims. While some Plaintiffs may be able to establish violations for specific pay periods, through use of pay stubs or specific recollection of work performed, the evidence will not support judgments in the amounts they anticipate.

Dated: October 14, 2011.                Respectfully submitted,

                                        LAW OFFICE OF THOMAS D. GEARON, P.C.

                                        By: s/Thomas D. Gearon

                                        Attorneys for Certain Defendants
                                        136-20 38th Avenue, Suite 10E
                                        Flushing, New York 11354
                                        (718) 395-8628

# APPENDIX A

You indicated **60** total hours were worked.

### Step 1: Calculate total straight-time earnings

**$600.00** for **6** days at a day rate of **$100.00** per day
**$600.00** total straight-time earnings

### Step 2: Calculate the regular rate of pay

Generally, the regular rate includes all payments made by the employer to or on behalf of the employee (except certain statutory exclusions). The regular rate is determined by adding together the employee's pay for the workweek and all other earnings and dividing the total by the number of hours the employee worked in that week.

**$600.00** straight-time earnings divided by **60** hours worked = **$10.00** per hour

### Step 3: Calculate the overtime premium pay

Remember the straight-time earnings have already been calculated for all hours worked, so the additional amount to be calculated for each overtime hour worked (i.e., the overtime premium pay) is one-half the regular rate of pay.

**$10.00** regular rate x **0.5** x **20** overtime hour(s) = **$100.00** additional half-time pay

### Step 4: Add straight-time earnings and the additional half-time pay

+  $600.00 straight-time earnings
   $100.00 additional half-time earnings
   _____
   $700.00 total straight-time earnings and overtime pay

## Relevant Overtime Pay Explanations

When an employee is paid solely on a **day rate** basis (whether on the basis of a single day rate or multiple day rates), and receives no other compensation, the employee's regular rate of pay is determined by totaling the sums paid at the day rate(s) for the workweek and dividing by the total hours actually worked during the workweek. (29 CFR 778.112).