```
            UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF NEW YORK

    ------------------------------X Docket#
ARTICA, et al.,                   : 09-cv-3796(RER)
              Plaintiff,          : 11-cv-842(RER)
                                  :
      - versus -                  : U.S. Courthouse
                                  : Brooklyn, New York
J.B. CUSTOM MASONRY &             :
CONCRETE, INC., et al.,           :
              Defendant           : December 6, 2011
    ------------------------------X
```

```
    TRANSCRIPT OF CIVIL CAUSE FOR CIVIL FAIRNESS HEARING
         BEFORE THE HONORABLE RAMON E. REYES, JR.
            UNITED STATES MAGISTRATE JUDGE
```

**A   P   P   E   A   R   A   N   C   E   S:**


**For the Plaintiff:**          **Brent E. Pelton, Esq.**
                                **Taylor Graham, Esq.**
                                Pelton & Associates, PC
                                111 Broadway
                                New York, NY 10006

                                **Dorothy A. O'Brien, Esq.**
                                Dorothy A. O'Brien
                                Attorney & Counselor
                                at Law, PLC
                                2322 E Kimberly Rd, Ste 100e
                                Davenport, IA 52807

**For the Defendant:**          **Thomas D. Gearon, Esq.**
                                **Leo Clarke, Esq.**
                                Law Office of
                                Thomas D. Gearon, P.C.
                                136-20 38th Avenue
                                Suite 10e
                                Flushing, NY 11354


**Transcription Service:**      **Transcription Plus II, Inc.**
                                3589 Tiana Street
                                Seaford, N.Y.  11783
                                Transcriptions2@verizon.net


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

Proceedings

1          THE CLERK:  All rise.  The Honorable Ramon E.

2   Reyes, Jr. presiding.

3          Civil Cause for Civil Fairness Hearing, docket

4   number 09-cv-3796, <u>Artica v. J.B. Custom Masonry &</u>

5   <u>Concrete, Inc.</u>

6          Counsel for plaintiff, please state your name

7   for the record.

8          MR. PELTON: Brent Pelton of Pelton &

9   Associates.  To my left, I have Taylor Graham, pending

10  admission and Sal Mejia, a paralegal.

11          THE CLERK:  For the defendants?

12          MR. GEARON:  Thomas Gearon for J.B. Custom

13  Masonry & Concrete, Alfredo Joseph Battaglia and J.B.

14  Contracting.

15          Good morning, your Honor.

16          THE COURT:  Good morning.

17          MR. WORMS:  Terrence Worms, W-o-r-m-s, 136-20

18  38th Avenue, Suite 10-E, Flushing, New York for Josephine

19  Battaglia and J.B. Holdings and the remaining defendants.

20          THE CLERK:  Let me just add that it's also in

21  the related case, 11-cv-842.

22          THE COURT:  Good morning.

23          Okay.  We're on today for final approval of the

24  settlement and approval of the application for attorney's

25  fees.  And I've received a number of submissions in

Transcription Plus II, Inc.

3

Proceedings

1   support of the motions.  They're on the docket sheet.

2          So why don't you tell me, Mr. Pelton, anything

3   you have to say.

4          MR. PELTON:  Your Honor, I believe that this

5   settlement should be approved as fair to the class, both

6   procedurally and substantively.  We had sent out notice

7   to all the class members.  We've had all the class

8   members come into our office.  We've provided them

9   physical notice there.

10          We've also sent them by letter notice and the

11   Honduras plaintiffs, we sent by e-mail and all of the

12   plaintiffs have signed off on the proposed allocation,

13   except for one, who remains unreachable.

14          THE COURT:  And who is that?

15          MR. PELTON:  That is Louis Martin.

16          THE COURT:  Okay.  When we discussed the

17   settlement previously, there were two plaintiffs who were

18   unreachable.  Mr. Martin was one of them?

19          MR. PELTON:  Yes, he was one of them and Val

20   Krishna Berson was the second.

21          THE COURT:  Okay.

22          MR. PELTON:  And we were able to get in touch

23   with Val Krishna and he did sign.  He had heart problems

24   but he's been at our office.

25          THE COURT:  And Mr. Martin's claim is for the

4

Proceedings

1  portion of the settlement that is -- his portion of the

2  settlement is I think the least of all the plaintiffs;

3  correct, or --

4          MR. PELTON:  Correct.

5          THE COURT:  -- or close to it.

6          MR. PELTON:  And I believe --

7          THE COURT:  No, the least.

8          MR. PELTON:  Correct.  And I believe that

9  that's fair to him because he worked, I believe

10  approximately a month for the company.  He was a very

11  short term employee.

12          THE COURT:  All right.  Okay.  And part of what

13  we've received is a series of printouts of spreadsheets,

14  the same spreadsheet with various signatures of each of

15  the plaintiffs.  The spreadsheet indicates their

16  allocution of the settlement or allotment of the

17  settlement, or however you want to characterize it, both

18  for the Fair Labor Standards Act and the New York Labor

19  Law claims.  And each plaintiff has signed off with the

20  exception of Mr. Martin, who we cannot find.

21          And your firm is seeking a third of the

22  settlement as its attorney's fees.

23          MR. PELTON:  Correct, your Honor.

24          THE COURT:  In addition to $17,000 in costs?

25          MR. PELTON:  Correct, your Honor.  I do have

5

Proceedings

1   one issue with regards to costs.  Pursuant to our

2   settlement, the remainder payment is to be secured by a

3   security interest on unencumbered property.  And

4   defendants have proposed that we use a residential

5   property located in Howard Beach.  And in order to

6   protect that security interest, a mortgage would have to

7   be filed upon that property.  And that's customarily a

8   fee that's paid by the person who is obtaining the

9   mortgage.  If you or I were to go to the bank, we would

10  have to pay for the title insurance and the mortgage

11  recording tax.  But the mortgage recording tax is 2.175

12  percent plus there'd be title insurance and title search

13  costs which we believe is a cost that should be bore by

14  the defendants because if they want to make a payment

15  plan, as they do, this is a customary expense that goes

16  along with --

17              THE COURT:  What is the total expense?

18              MR. PELTON:  It's about -- it's $11,745 just to

19  record the mortgage.  I don't know how much the title

20  insurance would be but the title search is approximately

21  $500.  And we also have some concerns about this property

22  securing the 400 and -- I'm sorry, $540,000 remainder

23  payment.  The property was purchased by the defendants in

24  1998 for $125,000 and there is an unrecorded mortgage for

25  $402,000 on the property.  Since that mortgage is not

6

Proceedings

1  recorded, if we were to get a mortgage and recorded it,

2  we would have priority over it.  But just seeing the

3  property, I don't think that it's worth $540,000.

4          THE COURT:  Well isn't it a little late to be

5  raising this?

6          MR. PELTON:  Uhm.

7          THE COURT:  It seems like a material term of

8  the settlement.

9          MR. PELTON:  The settlement was that they would

10  provide property to secure the mortgage and the draft

11  versions of the settlement agreement that we have been

12  exchanging has that if we find the value is less than the

13  settlement remainder, we can come to court and petition

14  for additional security.

15          THE COURT:  Are there any other ways of

16  securing the interest?  I mean, we could change -- we

17  could have this as a -- what happens if we were to have a

18  judgment filed in this court?

19          MR. PELTON:  A judgment as against all

20  defendants or --

21          THE COURT:  Who owns the property that you're

22  talking about?

23          MR. PELTON:  A corporation.  It's called 157-19

24  84th Street Corp.

25          THE COURT:  Okay.  They're not a defendant in

Transcription Plus II, Inc.

7

Proceedings

1  this action.

2          MR. PELTON:  Correct.

3          THE COURT:  Who are the officers of that

4  corporation?

5          MR. PELTON:  We believe that Alfredo Battaglia

6  is an officer.  We believe Rosa Sumaris (ph.), his

7  sister-in-law may also be an officer because she signed

8  for the corporation.

9          THE COURT:  All right.  And Ms. Sumaris --

10  she's not a defendant.

11          MR. PELTON:  She is not a defendant.

12          THE COURT:  Mr. Gearon, do you have anything to

13  say on this issue?

14          MR. GEARON:  On the real estate issue, your

15  Honor?

16          THE COURT:  Yes.

17          MR. GEARON:  We've had an appraisal on it.  It

18  was appraised at $650,000.  We would be more than happy

19  to provide that.  I respectfully disagree with counsel.

20  During our settlement conversations, your Honor, he was

21  very concerned about the fact whether or not if we went

22  into payments would this be secured.  And we provided to

23  him the actual address of the property.  So that's why I

24  differentiate with counsel on that.

25          It's certainly something that we can continue

Proceedings

1  discussion on because we're going to have some issues in

2  regards to the settlement as the Court proceeds today.

3            THE COURT:  All right.  Well, let's table the

4  issue of the property and how we secure the interest in

5  it.  What are the problems with the settlement?

6            MR. GEARON:  Your Honor, we have several points

7  that we've addressed in an e-mail to counsel regarding,

8  that was attached and was posted to ECF.  We agree in the

9  amount and principal in the aggregate is fair.  We don't

10  contest the attorney's fees.

11            One of the issues that has driven this case

12  throughout the entire litigation has been the dog bite

13  and the retaliation.  We don't outwardly oppose the

14  allegation.  We would ask that it be modified upwardly

15  for Mr. Galeano and the people that have alleged

16  retaliation.

17            Our position throughout the entire litigation,

18  your Honor, is that this was a wage and hour lawsuit.

19  We've provided 3,000 pages of data on particular payroll.

20  We don't believe that -- we do believe that the

21  allocation based on the methodology that counsel has come

22  up with is fair.  So we're not opposing it.  We would ask

23  that those particular claims, the Court would consider,

24  or counsel would consider that they would be modified

25  upward.

9

Proceedings

1    THE COURT:  Let me pull out the -- let's talk

2    in specifics.  There was only one claim that is the

3    assault claim for Mr. Galeano that's allocuted --

4    allocated any money.  That's $50,000.  Now do the

5    defendants want that to be more?

6    MR. GEARON:  Absolutely.  And also,

7    Mr. Vitucci, whose had a subjective claim, if your Honor

8    recalls and that's -- and in regards to plaintiff's

9    counsel, that's been a big issue throughout this trial.

10   Mr. Vitucci for retaliation, he has an outside claim

11   going on, as well.  So we would believe that counsel

12   should then explain to us why there shouldn't be an

13   allocation for that particular claim because

14   retaliation's always been a part of this particular

15   lawsuit.  And assault has always driven this particular

16   lawsuit.

17   THE COURT:  Correct that Mr. Vitucci and all

18   the other plaintiffs who have retaliation claims are

19   releasing the defendants from those claims through this

20   settlement; correct?

21   MR. GEARON:  Actually --

22   THE COURT:  With the exception of Mr. Vitucci's

23   EEOC charge of discrimination.

24   MR. PELTON:  Correct, which is pending before

25   the EEOC and could not have been a part of this action

Transcription Plus II, Inc.

10

Proceedings

1  because there's been no right to sue letter.

2          The allocation to Ernesto Galeano is really

3  $75,000 and then you takeaway a third for attorney's

4  fees.  So he receives $50,000 for that claim.

5          Any other retaliation is -- we thought would be

6  difficult to prove and difficult to assign a dollar value

7  to it.  We were hoping and expecting to receive punitive

8  damages for those instances of retaliation but it's hard

9  to allocate that in a settlement amongst a number of

10  class members.

11          So we thought that this was the most fair and

12  just way to allocate.  It was allocated based on our

13  overtime analysis plus a percentage of the unpaid

14  prevailing wage claims.

15          THE COURT:  I don't understand why the

16  defendant cares how the settlement is allocated.

17          MR. GEARON:  Your Honor, if I may?  From

18  everything that we've done in this litigation, that's

19  been pushed at this particular point.  If his Honor

20  believes that that's fair and reasonable, we'd be fine

21  with that.

22          THE COURT:  Uh-huh.

23          MR. GEARON:  There's some other issues, your

24  Honor.

25          THE COURT:  Okay.

11

Proceedings

1      MR. GEARON:  And we're using this as a model.
2  We had a case against the City of New York, Bocard v. The
3  City of New York (ph.).  And corporate counsel, we
4  settled the case for approximately $807,000 before
5  Judge Sullivan in the Second Circuit.
6      What we've asked for is that each individual
7  claim be signed and notarized.  The liquidated damages
8  allocation should be put on that particular claim.  Also,
9  any tax withholdings that should be applicable should
10  also enter on that particular form.  As we begin to get
11  those forms, then we can process -- we've already
12  retained a payroll company.  Those forms will come in.
13  We will give them to Mr. Battaglia's accountant.  He will
14  then forward them to the payroll.  They have to be
15  notarized and signed.  This protects my client moving
16  forward to say any time in the future someone could come
17  forward and say (a) I never got my check or (b) that
18  appropriate taxes were not taken out.  We believe two
19  checks should be issued; one for liquidated damages with
20  no withholding and one for back wages under the
21  settlement.
22      So we've asked counsel, and we think it's
23  pretty simple, to agree to that particular term.  They
24  have yet to respond to that actual request.
25      THE COURT:  Do you have a problem with that?

Proceedings

1     MR. PELTON:  That was -- if I am hearing this

2   correctly, we've always had an allocation, fifty-fifty

3   between liquidated damages --

4          THE COURT:  I think -- let me cut to the chase.

5   I think what Mr. Gearon is saying is that if I approve

6   the allocation of the damages as proposed by the

7   plaintiffs as fair and reasonable procedurally,

8   substantively, although they may disagree with it, they

9   can live with it.

10         The second issue is that in implementing this

11  allocation, what they want is a form signed that says

12  okay, Jesus Artica has an unpaid overtime claim of

13  $21,433.30.  That's after the attorney's fees is taken

14  out.  Of that, fifty percent is wages, fifty percent is

15  liquidated damages, signed and notarized.  And he will

16  get two separate checks; one for -- with the withholding

17  taken out for wages and then one with liquidated damages

18  presumably with a W-2 for the first one and a 1099 for

19  the second one.  And that's going to be done all by a

20  payroll company.  I don't think that's inconsistent with

21  the proposed final order approving the settlement,

22  although it may have more -- that maybe a more detailed

23  process to get the checks cut.

24         MR. PELTON:  We essentially don't object to

25  that.  A notary here in the United States is something

13
Proceedings

1  different from a notary in many Latin American countries.

2  A notary or a notary equivalent there can cost

3  significant amounts of money.  I certainly don't have a

4  problem providing notaries for people here in the states.

5  It may cost up to or over $100 per person to notarize

6  down in Honduras.  I don't know if there's another way

7  that we can resolve that.  But otherwise, I have no

8  problem.

9       THE COURT:  You can have it -- there's an

10  attestation provision in 28 U.S.C., I think it's -- I

11  think I am going to look for it right now.  I think it's

12  1397 or something like that.  It's not coming me quickly

13  but in 28 U.S.C., there's an attestation provision that

14  says I -- when you sign a declaration or you sign

15  something and you submit it to federal court, I hereby

16  declare pursuant to the provision, 28 U.S.C., blah, blah,

17  blah, that the foregoing is true and correct or something

18  like that.

19       MR. PELTON:  Yeah.

20       THE COURT:  Do that for the Honduran folks.  Is

21  that enough?

22       MR. GEARON:  Your Honor, that is enough and I

23  just want to say for the Court based on our experience on

24  101 plaintiffs, the administrative end of these as they

25  come in, they're documented.  They don't have to be all

14

Proceedings

1    forwarded at once.  We could begin processing so there's

2    no delay but we do need to be thorough on this particular

3    issue.

4                THE COURT:  Sure.

5                MR. GEARON:  And even in my 101 plaintiffs two

6    years ago, we still have four people that are outstanding

7    that we've taken steps and we've advised counsel and the

8    Court of different ways that we've attempted to notify

9    them, attempted to find them through the internet,

10   through private investigators, through publication.

11   We're not trying to delay.  The only thing we'd like to

12   do is be thorough in this particular issue.

13               THE COURT:  I appreciate that and I think

14   that's a -- this is a good suggestion.

15               MR. PELTON:  If I may, two other issues that we

16   see --

17               THE COURT:  Wait.  Regarding this or something

18   else?

19               MR. PELTON:  Regarding the settlement.

20               THE COURT:  Okay.  I want to hear from

21   Mr. Gearon.  He said he had a number of issues.

22               MR. PELTON:  Okay.

23               THE COURT:  So let's go through them one by

24   one.

25               MR. GEARON:  Yes, your Honor.  Thank you.  It's

Transcription Plus II, Inc.

15

Proceedings

1   our position that J.B. Custom Masonry & Concrete, Alfredo

2   Joseph Battaglia, and J.B. Contracting Alfredo is going

3   to be the guarantors on the settlement, your Honor.

4   　　　　　THE COURT:  Uh-huh.

5   　　　　　MR. GEARON:  And quite frankly, again through

6   this litigation, what we've heard many times are

7   Mr. Battaglia's assets.  He clearly is the deep pocket in

8   this particular litigation.  We don't believe on the

9   second complaint and I'll defer to Mr. Worms to comment

10  on that, that the other clients were actually brought

11  into the settlement conversations or there's substantial

12  evidence presented to that, they are actually liable, if

13  you will for a better word, under this particular

14  complaint.

15  　　　　　We're certainly willing to have Mr. Battaglia,

16  J.B. Custom Masonry & Concrete and J.B. Contracting be

17  the guarantors of the agreement.

18  　　　　　THE COURT:  Give me that again.  J.B. Custom --

19  　　　　　MR. GEARON:  Masonry --

20  　　　　　THE COURT:  Battaglia, J.B. Custom --

21  　　　　　MR. GEARON:  Right.  Concrete, Inc., Alfredo

22  Joseph Battaglia, individually and J.B. Contracting;

23  three corporations -- I mean, sorry, two corporations and

24  the individual.

25  　　　　　THE COURT:  All right.  So they would be the

Proceedings

1   parties -- you could have the two captions but it's --

2           MR. GEARON:  Correct.

3           THE COURT:  It's a settlement -- it would be a

4   settlement from plaintiffs against these three

5   guaranteeing -- those three guaranteeing the entire

6   settlement and all the other parties being released.

7           MR. GEARON:  That's correct, your Honor.

8           THE COURT:  All right.  The only issue -- and

9   I'll hear from Mr. Pelton -- the only issue I see with

10  that is the one that was raised initially about the

11  property and who owns that.  If we can work through the

12  plaintiff's concerns about equity which, you know, if you

13  have the appraisal and you -- you know, we can deal with

14  the recording and all that, whoever owns that entity I

15  think would have to also sign the settlement or there has

16  to be something to follow corporate formalities to bind

17  them as far as the property.

18          You have a problem, Mr. Pelton, with the

19  settlement being only as against Mr. Battaglia, J.B.

20  Custom Masonry & Concrete, Inc. and J.B. Contracting?

21          MR. PELTON:  Correct.  The only reason for

22  defendants to be concerned about this is if there's some

23  fear of non-payment.  If all payments are to be made, it

24  doesn't matter which defendants are liable for

25  guaranteeing the settlement.  J.B. Custom Masonry &

17

Proceedings

1   Concrete is a business entity that is currently doing

2   work.  J.B. Contracting, I believe, is a "doing business

3   as".  I don't think that that's a corporate entity.  And

4   Alfredo Battaglia certainly is a defendant here with deep

5   pockets but he's transferred his properties over the

6   course of time, before this litigation, including into

7   J.B. Residential, LLC, J.B. Property & Holding Corp. or

8   J.B. Holding & Property Corp.

9           So plaintiffs would never have entered into a

10  settlement fearing that assets would be transferred and

11  the settlement would never be made good.  So we just

12  don't see any reason why the defendants who actually own

13  property aren't guaranteeing the settlement.

14          THE COURT:  I --

15          MR. PELTON:  I'm afraid that I take on an

16  enormous amount of liability here if I allow the

17  settlement to be only as against J.B. Custom Masonry and

18  essentially Joe Battaglia.

19          THE COURT:  Bear with me just one second.

20          (Pause.)

21          THE COURT:  Anybody have a transcript of the

22  final -- the conference that we had when we were supposed

23  to start the trial and we went on the record?

24          MR. PELTON:  I do not have a transcript.

25          MR. GEARON:  No, your Honor.

18

Proceedings

1        THE COURT:  No, it's not on ECF, at least it's

2   not popping up.  All right.  Well --

3        MR. GEARON:  Your Honor, may I comment?

4        THE COURT:  Uh-huh.

5        MR. GEARON:  Your Honor, Mr. Battaglia is the

6   deep pocket, as we discussed.  Personal bankruptcy could

7   not shield him from this particular settlement.  If there

8   was any particular conveyances for whatever reason,

9   business reasons or whatever, and the Court were to find

10  that he did default, they could clearly undo those

11  particular conveyances without question.  And your Honor

12  has brought that to my attention prior to today.

13       Mr. Mannino's never been involved in any of

14  these settlement conversations.  He's never been brought

15  up.  He's never -- counsel's never spoken with him and at

16  the end of the day, I think it would continue to delay

17  this particular settlement.

18       If counsel wants to leave that open, we'll have

19  a conversation with Mr. Mannino.  If he wants to enter

20  into it, then he'll enter into it.  If he doesn't, we'll

21  have to deal with that situation when it arises.

22       We've always heard the entire litigation,

23  Mr. Battaglia's assets, Mr. Battaglia's assets, the dog

24  bite and other issues.  Now it's come, your Honor, to

25  actually put the four corners of the paper to make sure

Proceedings

1    that we secure payment.  We're certainly willing to do

2    that.  I don't have the authority and maybe Mr. Worms can

3    speak to enter into that particular agreement.

4              THE COURT:  Well the problem that's in my mind

5    is I don't recall specifically what was said on the

6    morning we were supposed to start trial when the case

7    settled.  Ordinarily, I will put the terms of the

8    settlement on the record and ask each party or the

9    representative of each party at the very least, do you

10   understand the settlement, and do you agree to those

11   terms.

12             I don't know if I did that here and I don't

13   have a transcript.  And if, in fact, I did do that and

14   asked each of the attorneys, then I understand

15   Mr. Gearon's points and I don't necessarily disagree with

16   them.  The problem is that if the party -- the

17   representative of the parties who are before me said that

18   they agreed to the terms of the settlement, I think the

19   parties are bound by it.

20             As we go deeper into this, I'm finding it

21   harder and harder to see that we can do final approval

22   today.  One way around this particular issue is -- and it

23   will change the terms of the deal, is to have in the

24   final order approving the settlement, some sort of for

25   want of a better term, liquidated damages provision that

20

Proceedings

1   says Mr. Battaglia, J.B. Custom, and J.B. Contracting are

2   the ones who are paying the settlement.  The other

3   parties are released.

4           If they don't follow through with the

5   settlement for whatever reason, there is a penalty that

6   kicks in, higher than the amount of the settlement.  If

7   the plaintiffs have to take the settlement, the final

8   order and go after assets because the money is not being

9   paid and it turns out that properties have been

10  distributed and, you know, the cost of pursuing that is

11  born by the settling defendants -- I mean, there are a

12  number of ways, you folks have done it in other cases,

13  I'm sure, of dealing with that.  I wish I had that

14  transcript because I think that might settle the issue.

15          MR. PELTON:  Your Honor, I'm happy not having

16  John Battaglia and Sal Mannino on the hook for this.  As

17  Mr. Gearon is correct, we're after the deep pockets of

18  Joe Battaglia which we believe is likely in these other

19  entities.

20          THE COURT:  All right.  So you're happy with

21  Sal Mannino and John Battaglia dropping out.

22          MR. PELTON:  Correct.  So long as we have

23  protection like exactly what you were saying.

24          MR. WORMS:  I apologize, your Honor.

25          THE COURT:  Go ahead.

21

Proceedings

1          MR. WORMS:  Maybe just for a point of clarity

2   though.  No one's mentioned Josephine, as well as whether

3   or not she would be pursued in the settlement agreement.

4   Additionally, one thing to keep in mind as I understand

5   that -- and I think the Court is absolutely correct and

6   has a great idea about the penalties that might ensue in

7   the event of default by the responsible parties, and also

8   to keep in mind that I don't believe that this is hidden

9   anywhere that even in those entities that may be

10  released, the real estate entities, let's say that were

11  in existence prior to this case --

12          THE COURT:  Right.

13          MR. WORMS:  -- those holdings or the interest

14  in those still belong to Joe Battaglia and the plaintiffs

15  would still have access to that and would still be able

16  to use those to secure the interest here.  The properties

17  themselves and the defendants themselves as a corporation

18  exist separate and apart but the interest is still in Mr.

19  Battaglia or excuse me, Alfredo Battaglia's pocket.

20          THE COURT:  Well he owns stock; right?

21          MR. WORMS:  Correct.  It's a hundred percent or

22  fifty -- and I apologize, I am thinking of the ones that

23  were subsequent that we were talking about, like 157 and

24  stuff like that.  But with regards to these two, he does

25  have stock.  It is an asset.

Proceedings

1          THE COURT:  Yeah, but you know as Mr. Romney

2    says, corporations are people, too.

3          MR. WORMS:  Yes.

4          THE COURT:  So people -- the corporations

5    themselves, if they're not bound by the settlement

6    agreement, would have a defense.  He's just a

7    shareholder.  You can attach his -- go after his one

8    share of stock and then -- I mean it's an added expenses.

9    I mean the -- of tracking down all the different avenues

10   to get to the ultimate piece of property.  But cost

11   shifting is a way of dealing with that also.

12         MR. WORMS:  Exactly, your Honor.  There would

13   be no objection to a specific term with regards to

14   liability for any fees and costs that would be taken upon

15   by the plaintiffs to pursue such means.

16         THE COURT:  The -- I really wish I had a

17   transcript.  Can we get a transcript of that final --

18   when they put the settlement on the record?  I mean

19   they're not going to prep it like in five minutes but

20   maybe by the end of the day, we'll have that and it may

21   answer this question.

22         Go ahead, Mr. Gearon.

23         MR. GEARON:  Your Honor, in Bocard court it

24   took us six months to actually come to an actual

25   agreement and I think two or three settlement hearings,

23

Proceedings

1  that's clearly not going to be the case here.  But as far

2  as the way I recall is that we had agreement in principle

3  based on a definitive agreement.  There are some minor

4  modifications that need to be made and I think your Honor

5  shed some light on both sides today.

6          THE COURT:  Uh-huh.

7          MR. GEARON:  One of the things I do request in

8  dealing with counsel is that we've addressed our points.

9  We would like them to be addressed point by point what

10  their position is --

11          THE COURT:  Uh-huh.

12          MR. GEARON:  -- as opposed to we need to get

13  this filed today and we're going to move forward.  We

14  agree, the aggregate amount is fair and reasonable.  We

15  agree, prong two, it doesn't frustrate the FLSA.

16  Judge Mary Day in the Eleventh Circuit is probably the --

17  wrote a 36 page decision on fairness hearings.  We

18  believe your Honor has absolutely hit both prongs and

19  we're going to move forward.

20          There are some issues to the corporation.  We

21  will -- I believe counsel and I can work them out in the

22  next couple of weeks.  We can provide documentation.  We

23  can, in the interim, we actually can provide the same

24  sheet that we used with corporate counsel.  If counsel

25  wants to make some adjustments on it, we'd certainly be

24

Proceedings

1  open to that.  And we could start to begin to process the

2  actual settlement claims.  But there's some issues here

3  that I am not so sure that we're going to get to today.

4        THE COURT:  All right.  I just want to come up

5  with a list of issues.  One issue that the plaintiffs

6  have is the property.  Then the other issue or one issue

7  that the defendants have is the procedure, the physical

8  procedure for cutting the checks and these notarized

9  forms which with my addition of the federal attestation

10 of true and correct, the plaintiffs can live with that;

11 right?

12        MR. PELTON:  Correct.  One other thing about

13 the procedure.  Some of our clients are in Honduras and

14 they're not able to open a U.S. bank account.  We had

15 talked about doing direct deposit which I think is

16 brilliant for the vast majority of our clients but

17 apparently if you go to a HSBC in Honduras, you can't

18 open an account there that we are able to direct deposit

19 to, based on my understanding.

20        So we're going to have to be able to work

21 together to figure out the best way to get this money

22 actually to clients.  And --

23        THE COURT:  What about --

24        MR. PELTON:  Wire transfer?

25        THE COURT:  No, not wire transfer.  What's the

25

Proceedings

1    place that you go to that --

2              MR. PELTON:  Western Union?

3              THE COURT:  Western Union.

4              MR. PELTON:  I don't know what the fees would

5    be for that.

6              THE COURT:  All right.

7              MR. PELTON:  But it could be --

8              THE COURT:  All right.  Then there's still

9    issues that need to be worked out clearly.  Who are the

10   parties?  Who are proper defendants?  What are the other

11   issues?  Anything else from the defendant's side?

12             MR. GEARON:  No.

13             THE COURT:  No?  Okay.

14             MR. WORMS:  Not at this time, your Honor.

15             THE COURT:  What about the plaintiffs?

16             MR. PELTON:  We just would like you to retain

17   jurisdiction until all payments are made. I think that

18   this addresses the issues that we have.  We have the

19   initial $400,000 payment that was supposed to be made, I

20   believe seven days from today.  We think that that should

21   still be made.  If we want to put it into escrow with the

22   Court, that's just fine with me.

23             THE COURT:  Okay.

24             MR. PELTON:  We can put it in escrow in my

25   account but I would prefer the Court.

Proceedings

1          THE COURT:  Or we can put it in escrow in Mr.

2    Gearon's account.

3          MR. PELTON:  Correct.

4          THE COURT:  Do you have any problem with me

5    retaining jurisdiction until all the payments are made?

6          MR. GEARON:  No, your Honor, I don't.  I would

7    just ask that -- and again, forgive me, I'm focusing on

8    the physical procedures to make sure that we've reached

9    the end in our goal is that monies will have to be

10   transferred to the payroll company and the proper

11   withholdings will be paid.  The liquidated damages, I'm

12   sure can get cut out of escrow checks.  The only thing

13   that I would ask is because we're in a payment plan, that

14   we agree on X amount of dollars will be paid up-front,

15   the allocations will be made accordingly and then on a

16   monthly basis, each individual will receive this amount

17   of dollars.  And again, your Honor, forgive me for just

18   focusing on the physical procedures that I want to make

19   sure --

20          THE COURT:  Nothing to forgive.  It needs to be

21   clear because if it's not and mistakes are made, I'm

22   going to get an application for holding someone in

23   contempt and I don't want that because I have plenty of

24   other work to do.  All right.

25          MR. GEARON:  And we want to do -- your Honor, I

27

Proceedings

1  apologize again, do we want to do something like $200,000

2  right now.  Is that okay for the plaintiffs or --

3              THE COURT:  Look, that is a material term --

4              MR. GEARON:  Okay.

5              THE COURT:  -- that I don't think should be

6  changed at this point.

7              MR. GEARON:  Okay.

8              THE COURT:  Here's what I am prepared to do.

9  Having looked at the papers and having presided over the

10  case, getting it ready for trial, presiding over at least

11  two if not three substantive detailed settlement

12  discussions with the parties, maybe even four, in my

13  opinion the settlement with the exceptions of these

14  issues that remain open which I consider to be fairly

15  minor, but nevertheless important, it's fair and

16  reasonable.  It is procedurally fair.  I mean it couldn't

17  be clearer to me that this settlement is the result of

18  arms length negotiations, contentious negotiations.  I

19  think the parties left the table at the end of the day

20  not happy but able to live with the settlement on both

21  sides which to me indicates that it is not the result of

22  any inside deals or cute games.  It's procedurally fair.

23              Substantively, it is also fair.  I think

24  although the settlement is at least what the plaintiffs

25  will get in their pocket is about a third of what they

28

Proceedings

1   would get in their opinion were they to go to trial and

2   win.  There are no guarantees in trial, especially when

3   the jury is concerned.

4           In addition, it would have been a long trial, a

5   difficult trial with many evidentiary rulings that would

6   likely be subject to review by the Circuit.  There's no

7   guarantee at the end of the day that if the plaintiffs

8   would have hit the jackpot with the jury, that the

9   Circuit wouldn't send it back to me because I would have

10  made a mistake.

11          And there's also the issue of collect-ability.

12  I mean there are many issues involved in the substantive

13  fairness which indicates to me that what the plaintiffs

14  are getting is fair.  As my dad used to say, "A bird in

15  the hand is worth two in the bush."  And this bird that

16  the plaintiffs are getting is not a small bird.

17          So I will approve the settlement as it's

18  currently drafted with the understanding that these four

19  issues that we've discussed will be worked out and put

20  into the order granting final approval of the class

21  action settlement.  And it's not a class action

22  settlement.  It's a collective action settlement; right?

23          MR. PELTON:  Correct.

24          THE COURT:  So let's change the title.

25          MR. PELTON:  Okay.

Proceedings

1    THE COURT:  Whatever agreements you reach as to

2  the property, how it's going to be secured, I want that

3  put into this.  The procedure that Mr. Gearon is

4  suggesting as far as cutting the actual checks to the

5  plaintiffs must be put into this.

6          If you are going to carve out any defendants

7  and put in a provision for liquidated damages in the

8  event of default, that needs to put in and you already

9  have the provision on retention of jurisdiction.  So that

10  is already covered.

11          You did mention that no one has objected; is

12  that right?

13    MR. PELTON:  Correct.

14    THE COURT:  Okay.  I don't think I need to have

15  anything beyond the order granting final approval of the

16  collective action settlement.  No other separate order

17  with my findings because I've made them on the record.  I

18  will retain the right though if after thinking about this

19  again, I need to do something more than what's been

20  provided, I will do that.  Okay?

21    MR. PELTON:  Your Honor?

22    THE COURT:  How -- go ahead.

23    MR. PELTON:  Could we have a deadline to do

24  this and I just want to make sure that the $400,000 is

25  paid into escrow.

30

Proceedings

1      THE COURT:  Can your client put that into your

2  escrow account, the date that was agreed.

3      MR. GEARON:  I have to verify that, your Honor.

4  I'll have to verify that today.

5      THE COURT:  All right.

6      MR. GEARON:  I agree with Mr. Pelton, if we can

7  have a control date, I think that would assist all

8  parties.

9      THE COURT:  All right.  Well I think if he

10  can't come up with the $400 grand to put into escrow -- I

11  mean it was going to be due seven days pursuant to the

12  settlement after the final approval.  I know this isn't

13  final approval but look, I would suggest that it get

14  done.

15      Miriam, did we order the transcript?

16      THE CLERK:  I'm going to (indiscernible).

17      THE COURT:  All right.  I also want the

18  transcript from this hearing.

19      THE CLERK:  This hearing?

20      THE COURT:  No, I want this -- today's

21  transcript.

22      THE CLERK:  Okay.

23      THE COURT:  And the one from the first day of

24  trial/settlement.

25      THE CLERK:  Okay.

31

Proceedings

1          THE COURT:  All right.  We're coming up on the

2    holidays.  It's now the 6th.  I'd like it by December 23.

3          MR. PELTON:  I think we could do it much sooner

4    than that if we're able to talk back and forth.

5          THE COURT:  Okay.  It's really two weeks.  All

6    right.  Let's do it this way.  If the money is not put

7    into escrow on the 13th, I want the final order on the

8    16th.  If it is put into escrow on the 13th, I'll give

9    you a little more time, the 23rd; understood?

10          MR. GEARON:  Whose escrow is that, your Honor?

11          THE COURT:  Yours.

12          MR. GEARON:  Okay.

13          THE COURT:  And if you want to start cutting

14    the checks and everything before then, I'll leave that up

15    to you.  You can -- if the defendants agree, you know,

16    start with the forms, get that going.  You know, that's

17    fine.  But I'll leave that up to you.

18          Now the one final thing is this procedure that

19    Mr. Gearon is suggesting is a good one but it's got to be

20    very specific because we're dealing with a payment plan.

21    Each plaintiff has an allocation for liquidated damages

22    and wages.  So you need to come up with a percentage of

23    the $400,000; each plaintiff for their liquidated damages

24    gets X percent of their claim and for their wages gets Y

25    percent or something like that.  And that's got to be

32

Proceedings

1    spelled out.  All right?

2            Or if you want to do the liquidated damages up

3    front and wages later, you could -- I mean you could do

4    it any number of ways but it's just got to be spelled out

5    very clearly.

6            MR. PELTON:  Your Honor, if we attempt to make

7    progress on these terms and are reaching an impasse, I

8    don't imagine that you mind us submitting a letter

9    informing you of that.

10           THE COURT:  A very simple joint letter.  We are

11   at an impasse on the following issues; boom, boom, boom.

12   No long discussion and then I'll get you on the phone and

13   we'll talk it out; all right?

14           MR. PELTON:  Okay.

15           THE COURT:  Okay.

16           MR. PELTON:  Thank you.  Thank you very much.

17           MR. GEARON:  Thank you, your Honor.

18           THE COURT:  Thanks.

19           MR. WORMS:  Good afternoon, Judge.

20               (Matter concluded)

21                    -o0o-

22

23

24

25

33

# C E R T I F I C A T E

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **6th** day of **December**, 2011.

Linda Ferrara
Linda Ferrara
Transcription Plus II, Inc.